Filed 10/4/23  BioCorRx v. Pellecome CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BIOCORRX, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> PELLECOME, LLC, <br><br> Defendant and Respondent. | G061435 <br><br> (Super. Ct. No. 30-2019-01101907) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Strickroth and Nancy E. Zeltzer, Judges.  Affirmed.  Request for judicial notice denied.

Grant Shenon, David M. Almaraz and Gabriela Gevorkian for Plaintiff and Appellant.

Esstein Becker & Green, James A. Goodman and Susan Graham for Defendant and Respondent.

\*          \*          \*

This is an appeal following a motion for summary judgment or adjudication (MSJ) filed by defendant Pellecome, LLC, against plaintiff BioCorRx, Inc. In this case involving a dispute over a Mutual Nondisclosure and Confidentiality Agreement (NDA), the trial court granted summary adjudication on BioCorRx's causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing, finding that BioCorRx could not establish Pellecome commercially exploited or financially benefitted from proprietary information. BioCorRx argues the court misinterpreted the NDA and incorrectly determined there were no triable issues of material fact, among other things. BioCorRx also argues the court abused its discretion by awarding Pellecome attorney fees. We conclude that Pellecome met the standard for summary adjudication and that BioCorRx failed to establish a triable issue of material fact. We further find no abuse of discretion as to the attorney fee award. Accordingly, we affirm the judgment.

I

FACTS[1]

BioCorRx is a Nevada corporation with its principal place of business in Orange County. It describes itself as "a leading-edge healthcare solutions company focused on improving the lives of those who struggle with alcohol, opioid and other addictive disorders; including eating and weight disorders." With respect to alcohol and certain opiod addictions, BioCorRx states its "program is a proprietary medication-assisted treatment . . . cognitive behavioral therapy . . . program that utilizes a multi-pronged approach to assist in addressing the underlying physical and behavioral issues of alcohol and opioid addiction." The medication component used naltrexone pellets. Naltrexone is an opioid antagonist approved by the FDA for the treatment of drug and

_____

[1] Our statement of facts is based on the evidence presented to the trial court. Unsupported factual statements – for example, those included in points and authorities without citation to supporting evidence – are disregarded.

2

alcohol addiction. (See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6353110 [as of August 31, 2023], archived at: http://perma.cc/4XBN-HRAE.)

In 2017, BioCorRx began to look into using its alcohol and opioid addiction treatments for what it refers to as "weight addiction." It called this program "UnCraveRX" and claimed it invested approximately $1.1 million into the program from 2017 to 2021.

Pellecome, which was founded in 2017, manufactured and sold pellet insertion devices, which were originally used to insert hormone replacement therapy pellets. Melissa Vinci-Rainis, Pellecome's CEO, had come across BioCorRx in the course of researching naltrexone, and she had noticed that BioCorRx was using 10 cc syringes to insert 10 mm diameter pellets, which she believed would cause a patient considerable discomfort due to the syringe's size. In August 2018, Vinci-Rainis contacted BioCorRx's then-CEO, Brady Granier, to discuss the use of Pellecome's insertion device in BioCorRx's alcohol and opiate addiction programs. At this point in time, the parties had not discussed weight loss programs.

On September 10, the parties executed an NDA. In relevant part, the NDA stated: "**Confidentiality**. 'Confidential Information' shall mean and include, without limitation, any and all information furnished by the Disclosing Party to the Receiving Party in tangible, visible, electronic or verbal form or by observation or by any other means, including, but not limited to, any trade secret or proprietary information, legal documents, research documents, patent applications, business plans, protocols, processes, samples, formulae, prospective and current products, clinical data and analyses, test results, toxicology and pharmacology information, study procedures and manuals, case report forms and their content, statistical reports, project management and staffing, manufacturing processes, financial data, forecasts and projections, proprietary software and database structures, research, 'know-how,' technology under development, marketing information, regardless of whether such disclosures are marked or otherwise designated

3

as 'Confidential' and including (but not limited to information disclosed between the parties prior to the date of this Agreement; and the terms and conditions of this Agreement, all proposals and requests for proposals (including those submitted to the Receiving Party prior to the date of this Agreement and marked as Confidential at the time of delivery), and the existence of the discussions between the Parties to which this Agreement pertains. [¶] The Parties agree that the Information will be kept strictly confidential and will not be used by either Party directly or indirectly for any purpose or in any business other than for the sole purpose of evaluating the Transaction. The Parties agree to transmit the Information only to those representatives who need to know the Information for the purpose of evaluating the Transaction, who are informed of the confidential nature of the Information and who specifically agree to be bound by the terms of this Agreement. The Parties will be responsible for any breach of this Agreement by their affiliates or representatives." The NDA also stated the parties agreed not to knowingly make use of any "'inside information'" for purposes other than completing the transaction between them, or to disclose any of the information. Other portions of the NDA will be discussed as relevant.

After the NDA was signed, Pellecome designed a larger insertion device for use with the naltrexone pellets. In September 2018, Pellecome's founder and medical director traveled to BioCorRx's California office to perform a demonstration. According to Vinci-Rainis, using a Pellecome device, BioCorRx could insert smaller pellets using the same dose of naltrexone. Many of her communications, after the NDA was signed, were with Lourdes Felix, BioCorRx's chief operating officer.

Pellecome became aware that BioCorRx was developing a weight loss program, and Vinci-Rainis and Felix had ongoing discussions about it. Sometime in the first half of 2019, Vinci-Rainis learned BioCorRx intended to call the program UnCraveRx.

4

In approximately March 2019, Felix told Vinci-Rainis that BioCorRx needed a medical director for the weight loss program. Vinci-Rainis introduced Felix to Dr. Kenneth Orbeck, then medical director at Pellecome, who was an expert on insertion devices. Orbeck subsequently became the UnCraveRx program's medical director. Vinci-Rainis and Felix continued to discuss purchase quantities and the logistics and cost of Pellecome's insertion device. In June, Vinci-Rainis sent Felix a proposed term sheet. The parties met on June 21 to attempt to negotiate an agreement, but the attempt failed. Approximately two weeks later, Felix informed Vinci-Rainis that BioCorRx would not use Pellecome's insertion device for the UnCraveRx program. Shortly thereafter, Orbeck resigned from BioCorRx.

According to Vinci-Rainis, after the BioCorRx deal fell apart, she spoke to employees of Pellecome and its partner companies to discuss "creating an overall wellness program using a Pellecome insertion device that we could market to aesthetics facilities. [Pellecome founder] Dr. Jacome, Dr. Orbeck, and I developed a marketing strategy focused on beauty, body composition, building muscle, detoxing the gut, craving control, and metabolic support."

On July 18, Pellecome sent out an e-mail announcing Pellecome FIT. At the time, the program was not complete or ready for launch, but Vinci-Rainis sent it to prime the market. At a meeting of Pellecome and its partners in August, it was decided that bioidentical hormone therapy (BHRT) "would be the basis of the program and that we would add a supplement line, naltrexone, and peptides. Naltrexone was not the focus of the program. Instead, it was just one of several tools for our customers (the practitioners) to utilize."

After learning of Pellecome FIT, BioCorRx believed that Pellecome had used BioCorRx's confidential information to develop the Pellecome FIT program in violation of the NDA. According to BioCorRx, "[i]t is very clear that Pellecome used illicit methods to gain confidential information from BioCorRx to learn about Naltrexone

5

pellet formulation and use it for its own Pellecome FIT Project. Without having access to BioCorRx's confidential information, Pellecome would not have been able to incorporate naltrexone into its own program nor could it have studied UnCraveRx's pricing structures, business models, plans for launch, and market size information to improve and perfect in its own Pellecome FIT program." This is the heart of BioCorRx's case.

On October 2, 2019, BioCorRx filed the instant action, asserting causes of action for breach of contract, breach of the covenant of good faith and fair dealing, unfair business practices under Business and Professions Code section 17200, and fraudulent concealment/misrepresentation.

Over two years later, Pellecome filed the instant MSJ, or alternatively, summary adjudication. After briefing and oral argument, on April 6, 2021, the trial court issued a eight-page minute order granting summary adjudication as to BioCorRx's causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. As to the each claim, the court found BioCorRx's claim "fails as a matter of law because BioCorRx cannot establish Pellecome commercially exploited or financially benefitted from BioCorRx's proprietary information." (Italics omitted.)

In July, BioCorRx voluntarily dismissed the entire action. Pellecome filed for attorney fees, and the court granted the motion in the amount of $222,932.55 based on the contractual language and Pellecome's status as prevailing party. Judgment for Pellecome was subsequently entered for $222,932.55 and $12,953.45 in costs. BioCorRx now appeals.

II

DISCUSSION

*Request for Judicial Notice*

BioCorRx requests this court take judicial notice of a page of Pellecome's web site dated November 30, 2022, a year and a half after the trial court issued its order

6

ruling on the summary judgment motion on April 6, 2021. There are numerous reasons to deny this request, but for the sake of simplicity, we shall deny it because it was not before the trial court. "Reviewing courts generally do not take judicial notice of evidence not presented to the trial court." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) BioCorRx does not contend, and we would not find even if they had, that this is an exceptional circumstance warranting a different finding. The request is denied.

*Summary Judgment Standard of Review and Statutory Framework*

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To prevail on the motion, a defendant must demonstrate the plaintiff's cause of action has no merit. This requirement can be satisfied by showing either one or more elements of the cause of action cannot be established or that a complete defense exists. (Code Civ. Proc., § 437c, subds. (o), (p); *Bardin v. Lockheed Aeronautical Systems Co.* (1999) 70 Cal.App.4th 494, 499-500.)

"[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id*. at pp. 850-851.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at p. 850.)

7

In performing our de novo review, we use the same procedure as the trial court. We first consider the pleadings to determine the elements of each cause of action. Then we review the motion to determine if it establishes facts, supported by admissible evidence, to justify judgment in favor of the moving party. Assuming this burden is met, we then look to the opposition and "decide whether the opposing party has demonstrated the existence of a triable, material fact issue." (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1438.) We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.)

*Breach of Contract*

As noted above, the party moving for summary judgment has the "initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 850.) In order to make this determination, we review the law and evidence relevant to the pleaded cause of action. If the moving party carries its burden of production on each element, the burden then shifts to the plaintiff to demonstrate the existence of a triable issue of material fact. (*Id.* at pp. 850-851.)

The only causes of action relevant here are breach of contract and breach of the implied covenant of good faith and fair dealing. "A cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." (*CDF Firefighters v. Maldonado* (2008) 158 Cal.App.4th 1226, 1239.)

Here, Pellecome argued successfully in the trial court that BioCorRx could not establish that Pellecome used any of its proprietary information, which would constitute a breach of the contract or the implied covenant. Pellecome pointed to

8

BioCorRx's discovery responses, which stated its contention that Pellecome took and used four categories of information: pricing structures, business model information, plans for launching UnCraveRx, and market size information. In support of its MSJ, Pellecome offered the declaration of Vinci-Rainis and deposition testimony from BioCorRx's chief operating officer to establish that Pellecome did not use any of that information in launching Pellecome FIT, and further, it was offering a very different product than UnCraveRx.

With respect to the four categories of information BioCorRx alleged Pellecome used, "Pellecome did not utilize BioCorRx's pricing structures, business model information, plans for launching UnCraveRx, or market size information in launching or marketing Pellecome FIT. Pellecome has never used that information, and it has no intention of ever using that information. As such, Pellecome has not commercially exploited that information or financially benefitted from that information." BioCorRx had pointed to the pricing information in an e-mail from Felix in June 2019. The e-mail stated that UnCraveRx's retail price to providers would be $995 for a three-month program and that it would include naltrexone pellets, a virtual platform, and a Pellecome device. Pellecome did not use this information, and as Vinci-Rainis stated in her declaration, it was "of no value to Pellecome for a number of reasons. First, Pellecome FIT is an entirely different program, with entirely different elements. The only similarity between the two programs is the use of naltrexone pellets. UnCraveRx relies only on naltrexone, but Pellecome FIT includes it as just one of four elements the provider may prescribe. Further, Pellecome FIT does not offer an app or counseling. Therefore, the total program pricing for a weight loss program consisting of a naltrexone pellet, a weight loss app, and counseling is of no value to Pellecome. Second, Pellecome FIT is not sold as a program. Instead, Pellecome sells each of the four elements separately, not per-program. Further, the elements are sold per unit: supplements are priced between $9.50 and $56.25 per unit; peptides are priced between $3.00 and $259

9

per unit; BHRT pellets are priced between $10.35 and $38.75 per pellet.  Pellecome does not yet have a price for naltrexone pellets.  Finally, Pellecome does not set the retail pricing of the Pellecome FIT products.  The practitioners set their own prices."

With respect to the "'business model,'" Vinci-Rainis stated she had not seen the document Pellecome indicated contained this information until it was produced in the course of litigation.  Further, it would have been of no use to Pellecome if she had, and much of the information included was either public information or readily ascertainable research.

As to the plans for launching UnCraveRx, Vinci-Rainis discussed a meeting agenda Felix had sent her in advance of a call in May 2019.  Pellecome did not use any of the information in the agenda to launch or market Pellecome FIT, and much of the information was not confidential, including physician training dates, a vendor with whom Pellecome had a preexisting relationship, and trade show information.

Finally, with regard to market size information, Vinci-Rainis discussed a document Felix had sent Vinci-Rainis while she was preparing the term sheet.  Pellecome, stated Vinci-Rainis, did not use any of that information because it was "a forecast for an entirely different product with a different pricing structure.  Further, the fact that there is a large market for weight loss programs is well known.  It is not confidential."  With respect to information on BioCorRx's portal, Vinci-Rainis's declaration stated she had not seen this information prior to the litigation, and therefore it had not been used in creating or marketing Pellecome's product.  Further, the information appeared to be solely related to alcohol and drug addiction treatment, and was of no value to Pellecome.  Lastly, regarding an investor presentation, Pellecome did not use any information therein.

Regarding the differences between the programs, Vinci-Rainis described Pellecome FIT in her declaration:  "Rather than focus exclusively on weight loss, Pellecome FIT is an overall beauty and wellness program.  It consists of four

10

components: BHRT, supplements, peptides, and naltrexone. BHRT is the base of Pellecome FIT. BHRT is used to correct hormone imbalances, which would otherwise impede weight loss and other health and wellness goals. BHRT is administered in pellet form and is inserted using Pellecome's device. Pellecome trains practitioners to prescribe each patient BHRT as a part of the Pellecome FIT program. The supplements provide additional benefits and are taken orally. The provider decides whether to prescribe supplements. The peptides provide additional support and can be inserted with a syringe, taken orally, or ingested through a nasal spray. The practitioner decides whether to prescribe peptides. The naltrexone provides additional weight loss support and is typically only prescribed to patients with substantial weight to lose. Naltrexone is administered in pellet form and is inserted using Pellecome's device."

Further, according to Vinci-Rainis, "[t]he only similarity between Pellecome FIT and UnCraveRx is the use of naltrexone, which is not always prescribed as a part of the Pellecome FIT program. In addition, UnCraveRx does not include BHRT, peptides, or supplements. UnCraveRx provides an app, and Pellecome FIT does not. Pellecome FIT provides an entirely different type of behavioral support from UnCraveRx. UnCraveRx provides counseling and direct-to-patient behavioral support, while Pellecome FIT does not. Instead, Pellecome FIT recommends that doctors advise patients on diet and exercise, but unlike UnCraveRx, Pellecome FIT does not advise patients directly regarding their behavior. It likewise does not offer or facilitate counseling or coaching to patients." Moreover, while Pellecome began selling BHRT and peptides in October 2019 and supplements in March 2020, "Pellecome has not sold any naltrexone pellets because Pellecome does not have a naltrexone formula or a naltrexone supplier." It intended to use a naltrexone pellet but had not done so at that time. BioCorRx had not supplied Pellecome with any of its formulas and Pellecome had not used any of BioCorRx's formulas.

11

In its response, BioCorRx did not directly dispute Pellecome's evidence regarding what information Pellecome had *used*. Instead, it repeatedly stated that Pellecome had "access" to proprietary information. Further, it did not dispute Pellecome's statements regarding the differences between the two companies' weight-loss programs, "to the extent this is what BioCorRx has been told by Pellecome." It claimed "Pellecome has not disclosed the full program" but offered no evidence that it had requested further discovery.

In one of its additional statements of fact, BioCorRx stated: "On July 22, 2019, texts are being exchanged between Melissa Vinci-Raines [*sic*] and Dr. Orbeck regarding the proprietary formulation of the UnCraveRX Naltrexone pellet and the advice of Wells pharmacy on how to circumvent the claim to the formulation." That statement does not, however, reflect the evidence. Only one text mentions any formulation. It states: "Ok- I spoke to Jason and he says your lawyer should response [*sic*] and I want you to here [*sic*] what Jason says he should write, so they can't claim 2% col & naltrexone. I think anyone that gets involved with them is crazy. They are bad news." BioCorRx offered no evidence that the "2% col & naltrexone" referred to is BioCorRx's confidential information. Accordingly, this does not create a triable issue of fact.

Instead of focusing on the facts pertaining to the disputed issues in the MSJ, BioCorRx's additional material statements of fact focus on what appears to be its real issue here – not that Pellecome used or benefitted from any of BioCorRx's proprietary information, but that Pellecome decided to start its own weight loss program once the prospect of a deal between the two companies fell apart, regardless of how different it was from BioCorRx's program. They offered undisputed facts such as "[i]n the medical industry, first to market garners a lot of strategic advantage and advantages in having the total market share," and "[p]erceived competition, even where there is no actual product by the competing company, has a detrimental impact on market ownership."

12

These statements do not create material issues as to whether Pellecome commercially exploited or financially benefitted from confidential information.

On appeal, BioCorRx recites the basic facts of the case to argue there was a triable issue of fact without precisely pointing out what the triable facts were in light of the language and purpose of the NDA. It also fails to cite to statements in its separate statement of material facts, which was the only evidence properly before the court.

BioCorRx argues the trial court applied the wrong legal standard and misinterpreted the contract, contending that the NDA must be interpreted in a manner that any "use" of the confidential information establishes a breach of contract. But given that we review summary adjudication de novo, whether the court erred on this point or was inconsistent on another is a bit of red herring. The only thing that matters is whether the motion was properly granted on grounds raised below, not the court's specific reasoning. (See *Caro v. Smith* (1997) 59 Cal.App.4th 725, 735.)

We begin with basic principles of contract interpretation. We must interpret a contract so as to give effect to the mutual intent of the parties at the time the contract was formed. (Civ. Code, § 1636.)[2] "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (§ 1638.) Courts must also endeavor to give effect to every part of a contract, "if reasonably practicable, each clause helping to interpret the other[s]." (§ 1641.) "Courts will favor an interpretation that gives meaning to each word in a contract over an interpretation that makes part of the writing redundant." (*Yahoo Inc. v. National Union Fire Ins. Co.*, *etc*. (2022) 14 Cal.5th 58, 69.)

In addition to the confidentiality clause cited above, the NDA included the following recital:

---

[2] Subsequent statutory references are to the Civil Code unless otherwise stated.

13

"WHEREAS Parties acknowledge that each is already active in business activities that are related.  [BioCorRx] employs medications pharmaceutically formulated and compounded for treating addiction.  [BioCorRx] also employs other programs for treating addi[c]tion.  It is likely that [Pellecome] may also have significant knowledge of the use of medications and programs to treat addiction.  The information to be kept confidential includes, but is not limited to, formulation, compounding procedure and protocols, product pricing, specifics of business models, training/education materials, and any other intellectual property held or controlled by the Parties.  *This agreement is not intended to prevent the Parties from offering products and services used to treat individuals using naltrexone should the parties not enter into a formal business relationship.  It is intended to ensure that neither Party commercially exploits and financially benefits from employing Confidential Information, Formulation and Know How garnered from the other as a result of the exchange of information contemplated under this Agreement.*"  (Italics added.)

BioCorRx relies on the following quotation from *Sabetian v. Exxon Mobil Corp.* (2020) 57 Cal.App.5th 1054, 1069:  "'The law has long distinguished between a "covenant" which creates legal rights and obligations, and a "mere recital" which a party inserts for his or her own reasons into a contractual instrument.  Recitals are given limited effect even as between the parties.'"  This is true as far as it goes, and if there is an arguable ambiguity between a covenant and a recital, the covenant should take precedence, and a covenant should not be implied from a recital.  But *Sabetian* also notes "'[i]f the operative words of a grant are doubtful, recourse may be had to its recitals to assist the construction.'"  (*Ibid.*)  Indeed, this reflects section 1068, which states:  "If the operative words of a grant are doubtful, recourse may be had to its recitals to assist the construction."  Further, as noted above, we must give effect to every part of a contract, "if reasonably practicable, each clause helping to interpret the other[s]."  (§ 1641.)

14

Here, the recital in question stated that the purpose of the NDA was not to limit each company from offering products and services using naltrexone if they failed to enter into a business relationship. "It is intended to ensure that neither Party *commercially exploits and financially benefits* from employing Confidential Information, Formulation and Know How garnered from the other as a result of the exchange of information contemplated under this Agreement." The trial court correctly interpreted the contract according to its explicit terms – a breach not only included "use" of the confidential information, but "use" was to be interpreted as commercial exploitation and financial benefit as stated in the recital. This is not about whether weight loss programs were completely excluded from the NDA, but whether any information allegedly used in violation of the NDA must be subject to the express limitation in the recital. In order to give meaning to each portion of the contract, this limitation must be included, and we disagree with BioCorRx that the language creates an "ambiguity."

In sum, we find that Pellecome met its burden to demonstrate that it should prevail as a matter of law. BioCorRx, however, failed to marshal the evidence to show that material issues of fact existed as to whether Pellecome financially benefitted or commercially exploited any confidential information. Accordingly, summary adjudication on this point was properly granted.

*Implied Covenant of Good Faith and Fair Dealing*

BioCorRx's other cause of action, as relevant here, was a breach of the implied covenant of good faith and fair dealing, "[a] plaintiff claiming breach must allege the defendant's wrongful conduct was contrary to the contract's purpose and the parties' legitimate expectations." (*Cordoba Corp. v. City of Industry* (2023) 87 Cal.App.5th 145, 156.) The implied covenant, however, "does not impose substantive terms beyond those of the contract." (*Ibid.*) BioCorRx offers no argument that this claim can somehow survive if summary adjudication on the breach of contract cause of action was properly

15

granted.  We therefore find no error in the trial court's decision to grant summary adjudication as to this claim.

*Attorney Fees*

"'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong"— meaning that it abused its discretion.'"  (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)

BioCorRx argues the trial court abused its discretion by awarding Pellecome $222,942.55 in attorney fees,[3] contending the fees were "unreasonable and wildly inflated."  Pellecome originally requested $321,898.50, but the trial court disallowed all fees incurred after the date summary adjudication was granted, with the exception of fees incurred to prepare the attorney fee motion.

BioCorRx's argument on the attorney fee motion is singularly unhelpful, claiming the hourly rates allowed were "unsupported and unreasonably high" without explaining why.  We reject this argument as lacking both factual and legal support. (*Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 108-109.)  BioCorRx also lists billing entries it believed were "unreasonable and excessive" without stating the reasons for that assertion beyond its own conclusory statement that these were "small tasks."  It is not our place, as the United States Supreme Court has stated, to micromanage attorney fee awards, and we decline to perform the item by item recalculation BioCorRx seeks here. (*Fox v. Vice* (2011) 563 U.S. 826, 838.)  The trial court disagreed with BioCorRx's assertions, and it has not established a manifest abuse of discretion.

---

[3] Without case authority, BioCorRx argues that because Pellecome filed a separate motion for costs, it was not permitted to file a separate attorney fee motion.  This contention is rejected.

16

### III

### DISPOSITION

The judgment is affirmed.  The request for judicial notice is denied.

Pellecome is entitled to its costs on appeal.

                                                MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


DELANEY, J.